**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**DAVID PRICE and ERNANDO**     :
**ASHOKA THOMAS,**     :
    :
            **Plaintiffs,**     :
    :
     - against -     :
    :
**FOX ENTERTAINMENT GROUP, INC.,** :
**FOX FILMED ENTERTAINMENT,**     :
**TWENTIETH CENTURY FOX,**     :
**TWENTIETH CENTURY FOX HOME**     :
**ENTERTAINMENT, INC., RED HOUR**     :
**FILMS, and RAWSON THURBER,**     :
    :
            **Defendants.**     :
-------------------------------------------------------X

**GREGORY JAMES GAUGEL and**     :
**YNOT VISIONS, A Partnership,**     :
    :
            **Intervening-Plaintiffs,**     :
    :
     - against -     :
    :
**DAVID PRICE and ERNANDO**     :
**ASHOKA THOMAS,**     :
    :
            **Plaintiffs,**     :
    :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/27/07

**OPINION AND ORDER**

**05 Civ. 5259 (SAS)**

FOX ENTERTAINMENT GROUP, INC.,    :
TWENTIETH CENTURY FOX FILM        :
CORPORATION, TWENTIETH            :
CENTURY FOX HOME                  :
ENTERTAINMENT, LLC, FOX           :
FILMED ENTERTAINMENT,             :
TWENTIETH CENTURY FOX,            :
TWENTIETH CENTURY FOX HOME        :
ENTERTAINMENT, INC., RED HOUR     :
FILMS, and RAWSON THURBER,        :
                                  :
            Defendants.           :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

This litigation involves two movies about a dodgeball competition in which a team of misfits or underdogs are pitted against a stronger team of bullies. Plaintiffs allege that defendants infringed the copyright of their 2001 screenplay *Dodgeball: The Movie* through production and distribution of *Dodgeball: A True Underdog Story*, a movie released by defendants in June 2004.  Following discovery, defendants moved for summary judgment.[1]  For the reasons discussed below, the motion is denied.

---

[1]     Both plaintiffs and defendants subsequently filed objections to certain evidence submitted in connection with this motion.  The Court's rulings on those objections are set forth in a separate order.  Plaintiffs also made two distinct summary judgment motions.  The Court will address those motions in separate opinions.

## I.   BACKGROUND

### A.   Facts[2]

Defendant Rawson Thurber graduated from the Peter Stark Producing Program at the University of Southern California ("Stark") in 1999.[3]  While at Stark, from 1998 to 1999, Thurber worked as a summer intern and a floater at the William Morris Agency ("WMA").[4]  During this period, Thurber worked with Shaun Redick, who was then an assistant to an agent, and Gregory McKnight, a literary agent and Stark graduate.[5]  Thurber left WMA in April 1999, and began working as an assistant to screenwriter John August in June 1999.[6]

Beginning in January through late February or early March 2001, plaintiffs Ernando Ashoka Thomas and his co-author, David Price, wrote a screenplay about dodgeball entitled *Dodgeball: The Movie*.[7]  Thomas registered

---

[2]      The facts summarized in this section are undisputed.

[3]      *See* Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 3.

[4]      *See id.* ¶ 4.

[5]      *See* Plaintiffs' Corrected Counter-Statement Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶¶ 240, 280.

[6]      *See* Def. 56.1 ¶¶ 5-6.

[7]      *See id.* ¶¶ 23-24.  Co-authorship is disputed among plaintiffs and intervening-plaintiffs and is the subject of a separate motion for summary judgment.  For the purposes of this motion, I assume, without deciding, that plaintiffs Thomas and Price are the authors of *Dodgeball: The Movie.*

the screenplay with the Writers Guild of America on March 28, 2001.[8]  The screenplay was never sold or produced.[9]

On March 20, 2001, Thomas and intervening-plaintiff Gregory James Gaugel ("James") held a screening of a low-budget independent film they had produced entitled *Raw Fish*, which Redick, then an agent-in-training in WMA's Independent Film division, attended.[10]  Sometime between March 21 and April 3, 2001, Redick met with Thomas and James at WMA to discuss *Raw Fish*.[11]  At that meeting, Thomas and James gave Redick a copy of the dodgeball screenplay.[12]

By April 26, 2001, Thurber had completed his first full-length draft of his screenplay, then-titled *Underdogs*.[13]  On May 25, 2001, Thurber registered *Underdogs* with the Writers Guild of America.[14]  In 2001, Thurber sent his script to three agents, one of whom was McKnight, but Thurber retained one of the other

---

[8]  *See* Pl. 56.1 ¶ 261.

[9]  *See* Def. 56.1 ¶ 27.

[10]  *See id.* ¶¶ 25-26, 32.

[11]  The precise date of the meeting is disputed.  *See id.* ¶ 34; Pl. 56.1 ¶ 264.

[12]  *See* Def. 56.1 ¶ 35.

[13]  *See id.* ¶ 14.

[14]  *See id.* ¶ 15.

3

agents.[15]  In 2003, however, due in part to the success of another project, Thurber retained McKnight as his agent, and McKnight remains his agent today.[16]

Defendant Red Hour Films, a film production company, decided to develop *Underdogs* into a motion picture.[17]  In June 2003, the Fox defendants acquired the rights to *Underdogs* and hired Thurber to direct the movie.[18]  The movie, re-titled as *Dodgeball: A True Underdog Story*, was released in theaters worldwide on June 18, 2004.[19]

### B.   Procedural History

On June 2, 2005, plaintiffs filed a complaint alleging copyright infringement under the Copyright Act of 1976.[20]  On May 9, 2006, the Court granted leave to intervene to James and YNOT Visions, A Partnership ("YNOT") (collectively, "intervening-plaintiffs").  On May 15, 2006, intervening-plaintiffs filed their complaint alleging copyright infringement against defendants and asserting cross-claims against each plaintiff alleging, *inter alia*, breach of

---

[15]   *See* Pl. 56.1 ¶¶ 297, 299.

[16]   *See id.* ¶¶ 301-303.

[17]   *See* Def. 56.1 ¶¶ 16-17.

[18]   *See id.* ¶ 18.

[19]   *See id.* ¶¶ 19-20.

[20]   *See* 17 U.S.C. § 101 *et seq.*

4

partnership agreement, breach of contract, misappropriation and conversion.  On June 14, 2006, plaintiffs answered intervening-plaintiffs' cross-claims and plaintiffs asserted their own cross-claim against intervening-plaintiffs, seeking declaratory judgment that neither James nor YNOT has any ownership or other interest in the *Dodgeball: The Movie* screenplay.

Following discovery, defendants moved for summary judgment against plaintiffs and intervening-plaintiffs.  In addition, plaintiffs moved for summary judgment on their cross-claim for declaratory judgment against the intervening-plaintiffs and dismissing the intervening-plaintiffs' complaint.[21] Plaintiffs also moved for summary judgment on defendants' affirmative defenses of laches, estoppel, consent, waiver and unclean hands.[22]

### C.    The Works

Because the determination of substantial similarity in a copyright case "requires a detailed examination of the works themselves," I have examined plaintiffs' screenplay *Dodgeball: The Movie* and defendants' movie *Dodgeball: A*

---

[21]    In an Opinion and Order issued simultaneously with this Opinion, this motion was granted. *See Price v. Fox*, No. 05 Civ. 5259, — WL — (S.D.N.Y. Jan. 26, 2007).

[22]    In an Opinion and Order issued simultaneously with this Opinion, this motion was granted in part and denied in part. *See Price v. Fox*, No. 05 Civ. 5259, — WL — (S.D.N.Y. Jan. 26, 2007).

*True Underdog Story.*[23]  A brief description of both works follows.

### 1.     *Dodgeball: The Movie*

*Dodgeball: The Movie* is a story about a young man, Matt, who grew up and lives in a dodgeball-obsessed Ohio town.  Growing up, Matt and his two friends were bullied by an older kid named Mitch, whose longtime girlfriend, Jessica, a cheerleader, is secretly the object of Matt's affection.  Over the years, Matt and his team of two childhood friends, Gordo and Jimmy, have tried but failed to beat Mitch's team at dodgeball.  Gordo is obese and eats constantly, and has a peculiar obsession with his own bowel movements.  Jimmy is shallow and is obsessed with women and sex.  Jimmy works for his mother, Shirley, who owns a lesbian bar.

In the beginning of the story, Matt decides to get a full dodgeball team together to beat Mitch in the annual national championship and win Jessica over.  Jimmy learns that Shirley's bar is sitting on a fault line and that she needs to come up with $20,000 for an insurance policy.  After trying in vain to recruit strong, athletic men for the team, Matt, Gordo and Jimmy settle on T, a nervous bartender at Shirley's bar who is the adopted brother and former dodgeball target

---

[23]      *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996).

6

of Mitch; Wana, an energetic patron of Shirley's bar with quick feet; and Charles, an alcoholic homeless man who can dodge beer bottles.

Matt and his newly assembled team lose their first match and decide to practice against "easier" teams. However, Matt's team is slaughtered by each of these stereotypically weaker teams, including teams of pregnant women, "Old Timers," and disabled people. Matt loses hope and tells the team to give up. Shortly thereafter, Matt is approached by an older man in a wheelchair. The man is Greg Maiwang, a Chinese-American former dodgeball champion, whose legs stopped working after he lost a match. Greg offers to guide the team and Matt accepts. Greg's training methods were unorthodox, including chasing the players in his wheelchair pulled by vicious dogs and feeding them a slimy green liquid. Greg is assisted by Samantha, Greg's younger attractive adoptive sister.

Matt's team grows stronger, and in a series of rematches against the teams that beat them before, Matt's team begins winning. Inspired by the team, Greg tries to walk again and miraculously gets out of the wheelchair and takes a few steps, but then trips and falls on his head and dies. Matt is devastated and blames himself for Greg's death. Samantha gives Matt Greg's book of dodgeball secrets that he was going to give him before he died.

The team then travels to Chicago for the championship tournament, which is being covered by two sports announcers who narrate the action. Matt's

7

team, renamed "Maiwang" after Greg, beats a series of teams, including a team of oddly spiritual young men led by a white boy with dread locks and a team of metermaids, and advances to the finals, which is to be held the next day. Mitch's team also advances to the finals.

That evening, Team Maiwang has a dinner celebration, which quickly gets out of hand. Early the next morning, Matt takes a walk on the dodgeball field to reflect, where Greg's ghost appears in the fog and reassures Matt that he was born to play dodgeball and that Greg does not blame Matt for his death. Matt returns to the hotel where he finds everyone in bad shape from the night before. Jimmy is still with the attractive blonde woman with whom he left the bar the night before, who is being paid by Mitch to keep Jimmy away from the finals. The team heads to the field and Jimmy arrives just in time to play.

Matt's team is moving slowly, and loses the first game. However, after a pep talk from Matt and some green liquid from Samantha, the team comes back to win the second game. The final game comes down to Matt against Mitch and two of his teammates. In an amazing move Matt knocks all three of Mitch's remaining players out and wins the match and the $30,000 prize. Jessica dumps Mitch and runs to Matt to kiss him, but Matt rebuffs her. Everyone celebrates at Shirley's bar, which is saved from demolition. Matt and Samantha kiss and then join the celebration.

8

### 2.    *Dodgeball: A True Underdog Story*

*Dodgeball: A True Underdog Story* (the "Motion Picture") is a story

about a conflict between two gym owners, Peter LaFleur and White Goodman.

Peter is an underachiever who owns and operates the rundown Average Joe's Gym.

Average Joe's employees and members include: Owen, a simpleton looking for

love; Dwight, an African-American; Gordon, a timid fan of obscure sports who is

married to a mail-order bride who hates him; Justin, a high school cheerleading

squad reject who has a crush on the head cheerleader; and Steve, who dresses and

talks like a pirate. White, a hyperbolic man who was once obese but is now a

fitness fanatic, owns and operates the local branch of the successful corporate

Globo Gym he founded.

Peter learns from Kate Veatch, a lawyer for White's bank, that White

has purchased the mortgage on Average Joe's and that White will foreclose unless

Peter can come up with $50,000 in 30 days. Peter and the group brainstorm ways

to raise the money to save the gym. From one of Gordon's obscure sports

magazines, the group learns about a dodgeball competition in Las Vegas that

awards a grand prize of $50,000, but only Justin knows how to play. Justin brings

in an old instructional video he watched in high school gym class featuring the

former dodgeball star, Patches O'Houlihan, to teach the team how to play.

9

In order to qualify for entry in the tournament, the team has to win the regional championship.  At regionals, the team loses to a team of girl scouts, but qualifies anyway because one of the girl scouts tested positive for steroids.  After the match, Patches O'Houlihan, the former dodgeball champion from the video, now much older and in a wheelchair, approaches Peter and offers to coach the team and Peter accepts.  Patches' training methods are unconventional, including throwing wrenches at the players to practice dodging.  Kate, a former softball player with a strong arm, joins Peter's team after being fired by White and rejecting White's advances.  Rumors begin to fly that Kate is a lesbian.

White also fields a team of bodybuilders from Globo Gym and an unattractive female Russian dodgeball champion, called the "Purple Cobras."  They get a spot in the competition through one of White's connections.

At the tournament in Las Vegas, Peter's team, the "Average Joes," win several matches and advance to the finals, where they must face the Purple Cobras.  The televised tournament is covered by two sports commentators who provide comic relief between the dodgeball action scenes.  The night before the final match, Patches is killed when a "Luck of the Irish" sign falls on him in a casino.  Peter loses hope.  Later that night, White offers Peter a $100,000 bribe in exchange for title to Average Joe's Gym and Peter's promise not to play in the finals, which

Peter accepts. The next day, Peter is sitting in an airport bar where he meets Lance Armstrong, the Tour de France cycling champion and cancer survivor, who shames Peter into returning to the tournament to play with his team.

At the finals, the match comes down to a sudden death confrontation between Peter and White. Peter takes out the scarf that Patches had given him before he died and asks Patches for guidance. Patches' face appears on the scarf and gives Peter a pep talk. Peter then takes the scarf and blindfolds himself. Peter dodges White's ball blindfolded and then hits White with his ball to win the match.

As the Average Joes are celebrating, White reveals to the team that Peter sold him the gym. Peter then reveals that he took the $100,000 bribe and bet it on Average Joes with 50 to 1 odds to win the championship. Peter has won $5 million, enough to buy a controlling interest in Globo Gym, which now owns Average Joe's Gym, and Peter fires White on the spot. As everyone is celebrating, Kate kisses a woman, leading Peter to believe that Kate is a lesbian, but Kate then kisses Peter and reveals that she is bisexual. The ending shows Peter in a commercial for the new and improved Average Joe's Gym, which White, once again obese, is watching from his couch while stuffing his face and grumbling.

11

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[24]  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[25]  A fact is material when it "'might affect the outcome of the suit under the governing law.'"[26]

The movant has the burden of demonstrating that no genuine issue of material fact exists.[27]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does "'not rely on conclusory allegations or unsubstantiated speculation.'"[28]  To do so, it must do

---

[24]   Fed. R. Civ. P. 56(c).

[25]   *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

[26]   *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[27]   *See, e.g.*, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[28]   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

12

more than show that there is a "'metaphysical doubt as to the material facts.'"[29]  In

determining whether a genuine issue of material fact exists, the court must construe

the evidence in the light most favorable to the non-moving party and draw all

justifiable inferences in that party's favor.[30]

### B.    Copyright Infringement

To prevail on a claim of copyright infringement, a plaintiff must

establish "(1) ownership of a valid copyright, and (2) copying of constituent

elements of the work that are original."[31]  A certificate of registration made before

or within five years of publication of a work is prima facie evidence of the first

element.[32]  To satisfy the second element of an infringement claim, "a plaintiff must

show both that his work was 'actually copied' and that the portion copied amounts

to an 'improper or unlawful appropriation.'"[33]

Because direct evidence is seldom available to prove "actual copying,"

---

[29]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[30]    *See id.*

[31]    *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

[32]    *See* 17 U.S.C. § 410(c).

[33]    *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

13

a plaintiff may fulfill this requirement with indirect evidence, "including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony."[34] "There is an inverse relationship between access and probative similarity such that 'the stronger the proof of similarity, the less the proof of access is required.'"[35] "It is only after actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work."[36]

## 1.   Actual Copying

### a.   Probative Similarity[37]

In determining whether two works are similar enough to prove actual copying, courts ask "whether an average lay observer would recognize the alleged

---

[34]   *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992) (quotation marks and citations omitted).

[35]   *Jorgensen*, 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

[36]   *Castle Rock Entm't*, 150 F.3d at 137 (quotations omitted).

[37]   The Second Circuit cautions that "'probative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence." *Id.* (quotation marks and citations omitted).

copy as having been appropriated from the copyrighted work."[38]  The Second

Circuit has noted that this is "a task generally performed after detailed examination

of the works themselves."[39]  A court must examine the alleged similarities "in such

aspects as the total concept and feel, theme, characters, plot, sequence, pace, and

setting."[40]

### b.    Access

A plaintiff has the burden of proffering "significant, affirmative and

probative evidence" establishing access.[41]  "Access means that an alleged infringer

had a 'reasonable possibility' — not simply a 'bare possibility' — of hearing [or

seeing] the prior work."[42]  Although a plaintiff's theory of access may be

attenuated, it "cannot be based on mere 'speculation or conjecture.'"[43]

---

[38]    *Warner Bros. v. American Broad. Cos.*, 654 F.2d 204, 208 (2d Cir. 1981) (citing *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)).

[39]    *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48-49 (2d Cir. 1986) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936)).

[40]    *Williams*, 84 F.3d at 588.

[41]    *Jorgensen*, 351 F.3d at 51.

[42]    *Id.* (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)).

[43]    *Id.  Accord Gaste*, 863 F.2d at 1067 ("Although [plaintiff's] theory of access relies on a somewhat attenuated chain of events extending over a long period of time and distance, we cannot say as a matter of law that the jury could

Access to a copyrighted work may be inferred from the fact that a work was widely disseminated at the time of copying.[44] Wide dissemination is established where "the allegedly infringed work has had considerable commercial success or is readily available on the market."[45] If the infringed work has not been widely disseminated, a plaintiff can prove access by showing "a particular chain of events or link by which the alleged infringer might have gained access to the work."[46] Given the "inverse relationship between access and probative similarity,"[47] in certain limited situations a plaintiff need not prove access at all, because the similarities between the two works are so "striking" that they alone

---

not reasonably conclude that [defendant] had access to the song through [the third party].").

[44]     *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 270 (2d Cir. 2001) (citations omitted).

[45]     *Silberstein v. Fox Entm't Group, Inc.*, No. 02 Civ. 1131, 2004 WL 1620895, at *7 (S.D.N.Y. July 19, 2004).

[46]     *Mowry v. Viacom Int'l, Inc.*, No. 03 Civ. 3090, 2005 WL 1793773, at *4 (S.D.N.Y. July 29, 2005).

[47]     *Jorgensen*, 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

serve "both to justify an inference of copying and to prove improper appropriation."[48]

In the Second Circuit, a plaintiff must generally prove that the creators themselves, and not merely an affiliated corporation, had access to the work that was allegedly copied.[49]  However, "[a] court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer."[50]  "An intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes ideas to him."[51]  "A copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere

---

[48]     *Arnstein v. Porter*, 154 F.2d 464, 468-69 (2d Cir. 1946). *Accord Jorgensen*, 351 F.3d at 56; *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997).

[49]     *See Jorgensen*, 351 F.3d at 53 ("Bare corporate receipt of [plaintiff's] work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access.").

[50]     *Id.* (quoting *Towler v. Sayles*, 76 F.3d·579, 583 (4th Cir. 1996)). *Accord Gaste*, 863 F.2d at 1067 ("Access through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work.").

[51]     *Jorgensen*, 351 F.3d at 53 (quoting *Towler*, 76 F.3d at 583).

17

opportunity to see the work . . . ."[52]

### 2.    Actionable Infringement

After establishing that copying has occurred, a court must examine

whether the "copying is quantitatively and qualitatively sufficient to support the

legal conclusion that infringement (actionable copying) has occurred."[53]  In

undertaking this analysis, courts should be aware that

> *dissimilarity* between some aspects of the works will not
> automatically relieve the infringer of liability, for 'no copier may
> defend the act of plagiarism by pointing out how much of the
> copy he has not pirated.'  It is only when the similarities between
> the protected elements of plaintiff's work and the allegedly
> infringing work are of 'small import quantitatively or
> qualitatively' that the defendant will be found innocent of
> infringement.[54]

The quantitative component of substantial similarity "concerns the

---

[52]    *Id.* (quoting *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 354-55 (4th Cir. 2001)).

[53]    *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997) ("At first glance, it might seem odd to pursue an inquiry as to 'substantial similarity' even after copying as a factual matter has been established.  However, the superficial anomaly reflects only a lack of appreciation of the difference between factual copying and actionable copying.  The former (probative similarity) requires only the fact that the infringing work copies something from the copyrighted work; the latter (substantial similarity) requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred.").

[54]    *Williams*, 84 F.3d at 588 (citation omitted) (quoting *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992)).

amount of the copyrighted work that is copied, which must be more than 'de minimis.'"[55]  Thus, a plaintiff must establish that the similarities between the two works amount to more than "random similarities" that "are of little importance in the works."[56]  Substantial similarity will be found if "'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same.'"[57]  "The qualitative component concerns the copying of expression, rather than ideas, facts, works in the public domain, or any other non-protectable elements."[58]  In addition, "scenes a faire," which have been described as "elements that follow naturally from a work's theme rather than from an author's creativity," are not entitled to copyright protection.[59]

---

[55]    *Castle Rock Entm't*, 150 F.3d at 138 (quotation marks and citations omitted).

[56]    *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 313 (S.D.N.Y. 1999) (citing *Williams*, 84 F.3d at 590).

[57]    *Boisson*, 273 F.3d at 272 (quoting *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 765 (2d Cir. 1991)).

[58]    *Castle Rock Entm't*, 150 F.3d at 138.

[59]    *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 194 (2d Cir. 2004).  *See generally Hogan*, 48 F. Supp. 2d at 309 (citing 3 *Nimmer on Copyright* § 13.03[B][4]); *see also Williams*, 84 F.3d at 589 (in a story about a dinosaur zoo, "electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are scenes a faire); *Walker*, 784 F.2d at 50 (in a depiction of policemen in the South Bronx, "drunks, prostitutes, vermin and derelict cars" are scenes a faire).

19

"Substantial similarity is customarily an extremely close question of fact."[60]  However, courts have granted summary judgment for defendants when each similar element between two works was held non-protectable as a matter of law.[61]

## III.  DISCUSSION

### A.  Valid Copyright

It is undisputed that Thomas owns a valid copyright in the screenplay *Dodgeball: The Movie* (the "Thomas Work").[62]  Therefore, plaintiffs have the burden of proof at trial only as to the second prong of a copyright infringement claim — copying constituent elements of the work that are original.  Plaintiffs offer no direct evidence of actual copying.  Rather, both parties focus their arguments on indirect evidence related to probative similarity and the reasonable possibility of access.

### B.  Actual Copying

---

[60]    *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980).

[61]    *See id.*

[62]    As mentioned above, there is a dispute over who among Price, James and YNOT shares ownership with Thomas, which is the subject of a separate summary judgment motion by plaintiffs against the intervening-plaintiffs. However, that dispute does not affect the undisputed fact that the Thomas Work is subject to copyright protection for purposes of this motion.

20

### 1.    Degree of Similarity

After examining both works and reading the evidence in the light most favorable to plaintiffs, I conclude that a jury could reasonably find that the two works contain similarities that are probative of copying.  Both works are superficial fast-moving comedies that spoof underdog sports films.  Each work tells the story of a group of misfits led by the main character who forms an underdog dodgeball team, pitted against a stronger rival team of bullies led by the main character's nemesis.  In each work, the underdog team decides to enter a national dodgeball tournament that awards prize money, which the team needs to save a business in distress:  in the Thomas Work, a bar owned by the mother of one of the players; in the Motion Picture, a gym owned by one of the players and frequented by the rest.

The progression of the teams in each work is similar.  In the beginning of both works, the team is uncoordinated, made up of very poor dodgeball players and loses to stereotypically inferior teams:  in the Thomas Work, the team loses to pregnant women, old men and disabled people; in the Motion Picture, the team loses to a troop of girl scouts.  In each work, a former dodgeball champion comes along unsolicited to coach the team.  Notably, both coaches are wheelchair-bound and use unorthodox training methods.  For

21

example, in both the Thomas Work and an earlier Thurber draft of the Motion Picture, the coach gives the players a slimy green power drink as part of their training.[63] The underdog team in both works begins to excel and as a token of the success, the main character in both works receives a gift from the coach:  in the Thomas Work, Matt receives Greg's book of family dodgeball secrets; in the Motion Picture, Peter receives Patches' scarf.  Moreover, in each work, the coach dies in a freak accident in the middle of the competition, causing the main character to lose hope and want to give up.  However, in each work the coach reappears as a ghost and speaks to the main character to provide words of wisdom and advice on how to win.

Moreover, several characters that appear either in the Motion Picture or in Thurber's earlier drafts share the name and certain characteristics of characters in the Thomas Work.  For example, as detailed above, the coach characters are quite similar.  Numerous parallels also exist between the character of Gordo in the Thomas Work and Gordon in the Motion Picture.  Not only are

---

[63]      Consideration of earlier drafts of the allegedly infringing work is proper. *See Mowry*, 2005 WL 1793773, at *10 n.15 (permitting review of prior drafts for the purpose of establishing actual copying).

their names almost identical,[64] but they share certain characteristics as well. Gordo and Gordon are both overweight and they both have a flaw that they must overcome to help the team win the semifinal match: Gordo must overcome his fear of using other people's toilet paper in order to make it in time to the match; Gordon must take control of his anger and channel it to dodgeball during the match when he is the last man standing on the team. In both works, Gordo and Gordon do overcome the flaws and save the day at the semifinals in a very similar manner, by miraculously nearly single-handedly eliminating almost every player on the opposing team. Still other character parallels are present. Both works have a character named Kate who plays dodgeball: in the Thomas Work, Kate is a lesbian on the metermaids team; in the Motion Picture, Kate is the bisexual player on the Average Joes. In both works, a young boy named Timmy appears in a short scene as one of the coach's mentees. There are also a few characters that appear in early Thurber drafts that share names with characters in the Thomas Work, such as Dick and Sam (short for Samantha in the Thomas Work).

---

[64]     Indeed, at one point in the Motion Picture, one of the characters actually refers to Gordon as "Gordo."

23

In sum, I find that there are sufficient similarities to raise an issue of material fact as to the issue of actual copying. The degree of similarity between these works is clearly an issue for the trier of fact.

### 2.    Access

It is undisputed that the Thomas Work was not widely disseminated.[65] Thus, in order to establish access, plaintiffs must demonstrate a "a particular chain of events or link by which the alleged infringer might have gained access to the work."[66] Because "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required,"[67] the jury's determination of the degree of similarity between the works will inform the requisite level of "reasonable possibility of access" that plaintiffs must show in order to establish actual copying. Nevertheless, given the Court's own analysis of the similarities and all of the additional evidence, I find that genuine issues of material fact exist such that a jury

---

[65]    *See* Def. 56.1 ¶ 28; Plaintiffs' Corrected Response to Defendants' Statement of Undisputed Facts ("Pl. Opp. 56.1") ¶ 28.

[66]    *Mowry*, 2005 WL 1793773, at *4.

[67]    *Jorgensen*, 351 F.3d at 56 (quoting 3 *Nimmer on Copyright* § 13.03[D], at 13-77).

could reasonably conclude that defendants had a reasonable possibility of access to the Thomas Work through a "particular chain of events or link."[68]

Plaintiffs offer several theories based on the evidence from which a jury could reasonably infer that Thurber had a reasonable possibility of access to the Thomas Work.  For example, plaintiffs assert that the evidence shows that Thurber's first full draft of the screenplay was created with "unusual speed" — within one month after the alleged date of access.[69]  "Unusual speed in the creation of a defendant's work may constitute evidence that the defendant had access to and used plaintiff's work . . . ."[70]  There is evidence that Thurber wrote approximately 90% of his 150-page first full-length draft after the alleged date of access, following months of writer's block and frustration.  The probative value of this evidence is enhanced by evidence that a number of the similarities discussed above begin to appear in Thurber's drafts in April — after the alleged access date.[71]  Indeed, almost all of the characters who have the same names as characters

---

[68]   *Mowry*, 2005 WL 1793773, at *4.

[69]   Plaintiffs' Corrected Memorandum of Law in Opposition to Defendants' Summary Judgment Motion ("Pl. Opp. Mem."), at 16-17.

[70]   *Herzog v. Castle Rock Ent't*, 193 F.3d 1241, 1256 (11th Cir. 1999).

[71]   Defendants argue that material written before Thurber allegedly had access to the Thomas Work should not be considered in assessing the similarity of the works.  However, the precise date of access as well as what material was in

in the Thomas Work, namely Gordon, Kate, Timmy, and Dick, appear for the first time in April drafts. Moreover, one of the most notable similarities between the two works, namely that the coach is in a wheelchair, also does not materialize until an April draft. Coincidence (even an "eerie" coincidence)[72] cannot explain away this evidence as a matter of law in this case; it is a question of fact for the jury.

Moreover, plaintiffs raise a genuine issue of material fact as to whether there is a reasonable possibility that Thurber had access through a third party intermediary such as Redick or McKnight. Redick undisputedly received the Thomas Work between March 21 and April 3, 2001. Based on the evidence, a jury could find that it is reasonably possible that Redick gave a copy of the Thomas Work to Thurber: Redick worked at WMA at the same time as Thurber; they were "business friends"[73]; and given the nature of the industry, they were likely to keep in touch in order to maintain networking connections.

---

existence at what time are disputed facts and cannot be used to support defendants' motion as all inferences must be drawn in favor of the non-moving party.

[72]   Declaration of Shirin Keen (counsel for plaintiffs) ("Keen Decl."), Ex. 3 at 184 (Thurber's own description of some similarities between the works, found in his December 7, 2004 email to John August).

[73]   Pl. 56.1 ¶ 401.

26

With respect to McKnight, a jury could find that there was a reasonable possibility that McKnight had access to the Thomas Work and that McKnight may have given it to Thurber. Redick testified that the sharing of scripts with literary agents (of whom McKnight is one) is common practice at WMA[74] and a jury could find that it is reasonably possible that Redick did so in this case, especially given the evidence that on March 30, 2001, McKnight requested copies of *Raw Fish* — Redick's project with Thomas.[75] In turn, a jury could find that there is a reasonable possibility that McKnight passed it on to Thurber based on evidence of McKnight and Thurber's prior and continuing relationship, namely that Thurber worked for McKnight while employed at WMA; that McKnight was one of only three agents to whom Thurber sent his screenplay; that McKnight later became Thurber's agent and remains his agent today; and that they both attended Stark and were likely to keep in touch to maintain networking contacts. The jury could also weigh the fact that one of the characters in the Motion Picture, a sports announcer, is named Cotton McKnight in finding that

---

[74]     *See id.* ¶¶ 282-284. *See, e.g., Jorgensen*, 351 F.3d at 55 (evidence that a Sony department "occasionally shares . . . material with 'affiliated' songwriters" could support a finding of access if it could be shown that defendants were "affiliated").

[75]     *See* Pl. 56.1 ¶ 278.

27

McKnight and Thurber had a more substantial relationship than they claim. Although Thurber and McKnight testified that they had no communications between 1999 and 2003,[76] given plaintiffs' evidence to the contrary,[77] issues of credibility arise that must be decided by the jury.

It bears repeating that plaintiffs need not prove that Thurber actually had access to the Thomas Work. Rather, plaintiffs burden is to show a *reasonable possibility* of access on the part of Thurber or his intermediary.[78] Reviewing the evidence in the light most favorable to plaintiffs, I find that a reasonable jury could conclude that there is a reasonable possibility that Thurber had access to the Thomas Work given the evidence of the speed at which he wrote his screenplay, the timing of the appearances of certain similarities between the two works, and the relationships he had with WMA employees who either actually had access or had a reasonable possibility of access to the Thomas Work.

---

[76]   McKnight did state that he bumped into Thurber at the 2002 or 2003 Sundance Film Festival and that he called Thurber at some point to tell him he read and liked the dodgeball script. *See* Pl. 56.1 ¶¶ 377, 381, 384.

[77]   *See, e.g.*, Keen Decl. Ex. 3 at 174 (email from McKnight's assistant to McKnight, dated February 6, 2002, relaying a message that "Thurber returned your call."); *id.* at 178 (email from McKnight's assistant to Zach Galifianakis, dated August 26, 2002, regarding a possible meeting between Galifianakis and Thurber, including a statement that "Rawson Thurber would like to meet with you").

[78]   *Jorgensen*, 351 F.3d at 53 (quoting *Bouchat*, 241 F.3d at 354-55).

## C.    Actionable Infringement

After examining each work's "total concept and feel, theme, characters, plot, sequence, pace, and setting,"[79] I cannot find as a matter of law that each and every similar element between the two works is non-protectable. A jury could reasonably conclude that "'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the works'] aesthetic appeal as the same.'"[80]

The jury will have to decide whether the similarities between the two works at issue here are substantial, and therefore actionable. This will require differentiation between similarities that constitute original artistic expressions and those that flow from non-protectable ideas, from scenes a faire, or from conventions of underdog sports stories and Hollywood films, or whether the similarities can be found in the prior art, such as *Happy Gilmore* or *Men with Brooms*. These questions are quintessentially fact-based disputes and cannot be decided as a matter of law.

---

[79]     *Williams*, 84 F.3d at 588.

[80]     *Boisson*, 273 F.3d at 272 (quoting *Folio Impressions*, 937 F.2d at 765).

29

## IV.    CONCLUSION

For the reasons set forth above, defendants' motion for summary

judgment is denied in its entirety.  The Clerk of the Court is directed to close this

motion [No. 57 on the Docket Sheet].  A conference is scheduled in this matter for

February 2, 2007 at 4 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              January 26, 2007

30

### - Appearances -

**For Plaintiffs:**

Guy Robert Cohen, Esq.
Neal Howard Klausner, Esq.
Shirin Keen, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, NY 10019
(212) 468-4800

**For Defendants:**

Robert H. Rotstein, Esq.
Lisa E. Stone, Esq.
Gregory R. Jones, Esq.
McDermott, Will & Emery, LLP
2049 Century Park East, 34th Floor
Los Angeles, CA 90067
(310) 277-4110

Christine A. Pepe, Esq.
Morgan, Lewis & Bockius LLP
340 Madison Avenue
New York, NY 10017
(212) 547-5400

**For Intervening-Plaintiffs**:

Leslie Haim Ben-Zvi, Esq.
Queller, Fisher, Dienst, Serrins, Washor & Kool
233 Broadway, 18th Floor
New York, NY 10279
(212) 719-5300

31